# IN THE UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF KENTUCKY

| | |
|---|---|
| MICHAEL HAGER, husband of ANGELA MERIDETH, and | ) )  ) |
| ANGELA MERIDETH, wife of MICHAEL HAGER, and | ) ) ) |
| PATRICIA MERIDETH, and | ) ) |
| DANNY MERIDETH, and | ) ) |
| DANIELLE MEREDITH, and | ) ) |
| AARON BROCK, | ) ) |
| Plaintiffs, vs. | ) ) ) **COMPLAINT** |
| GOVERNOR ANDREW GRAHAM BESHEAR in his official and personal capacities, and | ) ) ) **Jury Trial Demanded** |
| KENTUCKY CABINET FOR HEALTH AND FAMILY SERVICES SECRETARY ERIC C. FRIEDLANDER in his official capacity, and | ) ) ) ) ) |
| UOFL HOSPITAL, an assumed name corporation of UNIVERSITY MEDICAL CENTER, INC., A KENTUCKY CORPORATION, and | ) ) ) ) ) Civil Action No. 3:22-CV-139-CHB |
| DEAN WATTS, JUDGE EXECUTIVE, NELSON COUNTY, in his official and personal capacities, and | ) ) ) ) |
| LINCOLN TRAIL HEALTH DEPARTMENT PUBLIC HEALTH DIRECTOR SARA JO BEST in her official and personal capacities, and | ) ) ) ) |
| RAMON PINEIROA, -NELSON COUNTY SHERIFF, in his official and personal capacities, and | ) ) ) ) |

|                                                      |   |
|------------------------------------------------------|---|
|                                                      | ) |
| MATTHEW HITE, COUNTY ATTORNEY,                       | ) |
| In his official and personal capacities, and         | ) |
|                                                      | ) |
| HON. JACK SEAY, JUDGE,                               | ) |
| NELSON CIRCUIT COURT, 10TH DIVISION                  | ) |
|                                                      | ) |
|         Defendants.                                  | ) |

## I. INTRODUCTION

"The sacred rights of mankind are not to be rummaged for among old parchments or musty records. They are written, as with a sunbeam, in the whole volume of human nature, by the hand of the divinity itself, and can never be erased or obscured by mortal power."

*Alexander Hamilton*
*The Farmer Refuted, February 5, 1775*

"Absolute and arbitrary power over the lives, liberty and property of freemen exists nowhere in a republic, not even in the largest majority."

*Kentucky Constitution § 2*
*Absolute and Arbitrary Power Denied*

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## II. THE PLAINTIFFS

1. Plaintiffs are, as follows:

2. **Michael Hager** has COPD and emphysema. Michael has been a First Responder for almost 30 years and worked as a 911 dispatcher (EMS, police and fire) since March of 1998, a firefighter (Meade County, Payneville County and one other county) for 23 years, and as deputy sheriff (Meade County). He was a resident of Nelson County when most of the events described herein took place.

3. **Angela Merideth** is wife to Michael Hager, daughter to Danny Merideth, and mother to Aaron Brock. She was a resident of Nelson County when most of the events described herein took place.

4. **Danny Merideth** is Michael Hager's father-in-law. At the time of the wrongful imprisonment, Danny had COPD, emphysema and complete heart failure, and he required oxygen therapy 24-hours a day, together with other life extending

3

medication. Mr. Hager has a massive hernia on his right side and a hernia on his chest cavity.

5. **Patricia Merideth** is Angela's mom. She suffers from Chron's disease, Lupus and depression, for which she takes medication. She was a resident of Nelson County when most of the events described herein took place.

6. **Aaron Brock**, age 28, is the son of Angela Merideth. Aaron has autism but he enjoys high normal function when he receives certain medication, including without limitation, Concerta and sleep medication at night. He has a bachelor's degree in Psychology.

7. **Danielle Meredith** is Angela Merideth's cousin, age 46. She helps Angela take care of the house, Angela's father, and things in general, when she's not working.

### III. THE DEFENDANTS

8. Defendants are State or County officials who reside in Kentucky, and/or individuals who reside in Kentucky.

9. ERIC C. FRIEDLANDER is, and at all relevant times has been, the Secretary of the Kentucky Cabinet for Health and Family Services ("KCHFS"). Defendant Friedlander is being sued in his official capacity.

10. GOV. ANDREW GRAHAM BESHEAR is, and at all relevant times has been, the Governor of the Commonwealth of Kentucky. Defendant Beshear is being sued in his official capacity as well as in his individual capacity.

11. UOFL HOSPITAL, is an assumed name corporation of UNIVERSITY MEDICAL CENTER, INC., A KENTUCKY CORPORATION.

12. DEAN WATTS, sued in his official capacity as well as in his individual capacity, is and/or was at all relevant times also the JUDGE EXECUTIVE of NELSON COUNTY.

13. SARA JO BEST, sued in his official capacity as well as in his individual capacity, is and/or was at all relevant times also the Public Health Director of LINCOLN TRAIL HEALTH DEPARTMENT.

14. RAMON PINEIROA, sued in his official capacity as well as in his individual capacity, is and/or was at all relevant times also the NELSON COUNTY SHERIFF.

15. MATTHEW HITE, sued in his official capacity as well as in his individual capacity, is and/or was at all relevant times also the NELSON COUNTY ATTORNEY.

16. HON. JACK SEAY, an individual, is and/or was at all relevant times also A CIRCUIT JUDGE, NELSON CIRCUIT COURT, 10TH DIVISION.

17. Defendants JANE AND JOHN DOES 1-20 are other business entities, State Officials and/or Kentucky Residents who may be joined to this Lawsuit at a later date.

## IV.  STANDING, VENUE AND JURISDICTION

18. This Court exercises subject matter jurisdiction in accordance with the provisions of 28 U.S.C. § 1331, as this litigation involves multiple claims and issues arising, without limitation, under the 1st, 4th, 5th, 6th. 9th and 14th Amendments to the U.S. Constitution, and related precedent.

19. This Court exercises subject matter jurisdiction in accordance with the provisions of 42 U.S.C. § 1983, as this litigation involves the deprivation of rights, protections, privileges and immunities secured by the U.S. Constitution.

20. There is a "case or controversy" within the meaning of Article III of the federal Constitution since the Plaintiffs all have claims for civil money damages asserted under 42 U.S.C. § 1983.

21. This Court exercises supplemental jurisdiction over related Kentucky state law claims under 28 U.S.C. § 1367.

22. Venue lies in this Court under 28 U.S.C. § 1391(b)(1), since at least one Defendant resides in this judicial district, and all Defendants reside or conduct business in the Commonwealth of Kentucky.

23. Plaintiffs have standing to bring this litigation, since they can establish that (1) they have suffered some actual or threatened injury, (2) the injury can fairly be traced to the challenged actions of the Defendants, and (3) the injury is likely to be redressed by a favorable decision of this Court. <u>N.H. Lottery Comm'n v. Rosen</u>, 2021 U.S. App. LEXIS 1526 *15-17, quoting <u>Lujan v. Defs. of Wildlife</u>, 504 U.S. 555, 560 (1992).

## V. **HISTORICAL CONTEXT**

24. More than 110 years ago, at a time when medicine was not yet sufficiently advanced to have developed penicillin and the germ theory of medicine was still new, the Supreme Court of the United States made a ruling related to a citizen's rights in healthcare that has remained largely unaddressed to this day. Over the century plus of time that has since passed the court has decided many critical

cases revolving around individual rights that have never been squared with Jacobson. Jacobson v. Massachusetts, 197 U.S. 11 (1905). A century ago, many of our most sacred and fundamental rights were still being sorted out.

25. Today, under the guidance of an unelected administrative structure, many of the rights our Supreme Court has determined are fundamental under our Constitution are being denied. In the case we bring before this court, the results of this corrupt administrative nightmare have trickled down to impact the rights of the Plaintiffs. Despite the enormity of the issue, the *Jacobson* Court provided a path to justice in stating:

> "Before closing this opinion, we deem it appropriate, in order to prevent misapprehension as to our views, to observe -- perhaps to repeat a thought already sufficiently expressed, namely -- that the police power of a State, whether exercised by the legislature or by a local body acting under its authority, may be exerted in such circumstances or by regulations so arbitrary and oppressive in particular cases as to justify the interference of the courts to prevent wrong and oppression." (*Id*, 197 US 38)

## VI. **TIMELINE and STATEMENT OF FACTS**

26. The following timeline and statement of fact provides a concise description and overview of the main facts known to the Plaintiffs, consistent with the rules of pleading. These facts are without limitation and additional parties and facts are anticipated coming to light throughout discovery. All statements and allegations are based upon information and belief of the plaintiffs.

27. <u>March 2, 2020</u>: Angela called Michael's pulmonologist because he was having a COPD/emphysema episode and his pulse oxygen was low. Michael was prescribed and was started on steroids, antibiotics and nebulizer treatments.

28. <u>March 06, 2020</u>: Governor Beshear declared a State of Emergency in an Executive Order <u>that admitted within its own text that it was a pre-emptive declaration just in case an Emergency did actually strike.</u>

29. <u>March 8, 2020</u>: Angela called Michael's pulmonologist office, advised her that if Michael's oxygen dopped another 3 points lower, he would need to check into the hospital.

30. <u>March 10, 2020</u>: Michael's oxygen dropped to 72, and Angela checked him into UofL, where she remained by his side until March 12. Michael continued COPD/emphysema protocol including steroids, antibiotics and nebulizer treatments. The ER doctor on call wanted to intubate Michael, but Michael refused to be intubated and was placed in an ICU room, where he remained until the morning of March 12.

31. <u>March 12, 2020</u>: At or about 2:00 pm, Michael was transferred out of ICU to a room, possibly room 108, which he shared with another patient named (REDACTED). Michael was placed in Bed #2. Nurses were entering and exiting the room with no masks on, to assist with Michael's breathing treatments every 2 hours. There was no mention of COVID-19 at this time. Michael never received a COVID-19 test and he was not symptomatic for COVID-19.

32. <u>March 12, 2020 (continued)</u>: At or about 6:30 pm, Michael's "roommate" was discharged and an unmasked hospital custodian entered and cleaned the roommate's side of the room. At this time, Michael and Angela had already been around and exposed to more than 100 employees, student doctors, nurses, visitors and other patients, etc., since entering the hospital 2 days prior.

8

Angela, Michael's wife, left the hospital at 7:00 for the first time since March 10th. She returned home to shower, eat, and prepare for Michael's homecoming.

33. <u>March 12, 2020 (continued)</u>: At or about 10:00 pm, Michael called Angela and informed her that the doctors told him he has COVID-19.

34. Angela immediately returned to the hospital, where no one was wearing a mask. Angela requested to speak with the doctor that diagnosed Michael with COVID-19 because Michael was upset and scared by the diagnosis. After a 30 minute wait, Angela was told "it's not possible" to speak with the doctor who diagnosed Michael because that person was not an actual doctor. Rather, the supposed doctor was actually a hospital administrator. Upon information and belief, the administrator had access to information about the COVID-19 money from the CARES ACT and other potential sources, for declaring that a patient had COVID-19, especially if that person ended up being intubated.

35. A first-year resident, wearing no mask, was dispatched to Michael's room to talk with Michael and Angela. The resident was visibly shaken and had no information to provide or advice to give, so Angela stated that she was signing Michael out, whereupon hospital staff revealed that the head of Infectious Disease was the doctor/administrator who spoke with her husband.

36. Nursing staff completed Michael's discharge. After the discharge was complete, the resident mentioned above appeared with a piece of paper claiming that Michael was signing out against medical advice. Angela wrote at the bottom of the paper "Nothing was clearly explained. Refused doctor to come speak to us." The Hagers then returned to their home.

37. On or about the date of Michael's discharge, Angela printed a full set of his medical records. Sometime after the events described herein below, Angela printed a duplicate set of medical records and discovered that what appeared to be a fraudulent PCR "test" result from State lab had been inserted into Michael's medical records, after the fact. The document indicated a PCR positive for Covid-19, however, Michael had never been given a Covid-19 nasal swab test, or any other kind of Covid-19 test. The apparently fraudulent test result document did not include a chart number, date of symptoms, and it contained no patient number. The test result document mentions symptoms including fever and respiratory, but Michael never exhibited a fever during his time in the hospital. The test result document was not related to Michael and may not have even been a real test result for any person. In either event, inserting it into Michael's medical record as part of a concerted cover-up appears to have been fraudulent and unlawful.

38. <u>March 13, 2020</u>: At or about 10:30 pm, Plaintiffs Michael and Angela received calls individually on their cell phones from individuals who initially refused to identify themselves. The individuals called from different telephone numbers but seemed to be coordinating their calls so that Michael and Angela would be talking at the same time to each of them. A female began to interrogate Angela demanding private personal identifier information, the names of everyone who lived at Angela's address and an explanation of who they had been around. Angela did not believe it was legitimate because of the time of day and their refusal to identify themselves. The female on the telephone then claimed she was from Lincoln Trail

Health Department and began to shout abusively at Angela, so Angela disconnected the call.

39. At the same time, Michael had been fielding a similar phone call. He also disconnected his call. About five minutes later, the abusive female who called Angela called her back a second time. She told Angela that she better cooperate and that she might as well cooperate because "she was actually speaking to Michael right now." This was obviously false, and Angela disconnected the call a second time because the hour was late and the person on the phone was abusive and dishonest.

40. <u>March 14, 2020</u>: At or about 9:30 am, the next morning, a white SUV, unmarked, appeared in Michael and Angela's driveway. An individual female, covered head to toe in personal protective equipment (PPE) including a a mask, exited the vehicle and banged on the front door of the house. Said female refused to present any identification. She stated that she was there to make sure everyone stayed in the house. She then demanded that everyone stayed in the house. The family did not invite her into the house because she was masked, appeared suspicious and refused to present any documentation. The female returned to the unmarked SUV. Someone in the passenger seat shouted "we will be back, don't go anywhere" as the SUV sped off.

41. <u>March 14, 2020</u> (continued): At or about 3:00 pm, a white SUV bearing a Lincoln Trail Health Department logo appeared in the Plaintiffs' driveway. This time, Defendant Sara Jo Best and Defendant Sheriff Ramon Pineiroa disembarked, leaving behind another deputy, who remained in the SUV.

42. Defendant Pineiroa stepped onto the front porch of Plaintiffs' home and served upon them an Ex Parte Order for Protective Services, seizing immediate emergency guardianship of Michael. The Order falsely stated that Michael was currently in a state of abuse and neglect. It falsely stated that he had been diagnosed with Covid-19 and further falsely stated that Michael needed protective services because he lacked the capacity to consent and that he had refused to consent. In point of fact, neither Michael nor any other Plaintiff had been asked to consent to anything. The Order also stated that no family or other adults were available in the house to assist Michael and that's why emergency guardianship had been given to the Lincoln Trail Health Department. All these assertions were false and fraudulent.

43. Upon information and belief provided by former counsel for Plaintiffs who has since passed away, the Center for Disease Control (CDC) and the state lab did not currently have Covid-19 tests available to administer to Plaintiffs, and that's why they were being forced to quarantine.  However, UofL directly or by one of its' agents falsified a document purporting to be a test result claiming that Michael had Covid-19.

44. Defendant Pineiroa then provided another document, 6 copies, one each for everyone in the house, indicating that the Plaintiffs were aware there were other adults in the house that they never interviewed.

45. Defendant Pineiroa posted armed deputies surrounding the Plaintiffs' house, imprisoning them on threat of arrest from 3:30 pm on March 14, 2020 until 12:00 pm on March 25, 2020.  Defendant Pineiroa posted an armed Sheriffs Deputies around the clock at Plaintiffs' place of imprisonment during this entire time.

46. As a result of the imprisonment the Plaintiffs were deprived of medicine and medical supplies. They were deprived of all basic supplies. They were deprived of food. They were deprived of the company and support of their friends and neighbors. They were deprived of the full support of the body of believers they belong too, where caring for one another and accepting care are both integral expressions of the Christian faith. During this time the Plaintiffs were not permitted to take out the trash and had to simply allow it to pile up.

47. During their forced imprisonment, which forced 6 people, 3 dogs and 4 cats into close confinement, they were harassed every 12 hours to provide information about their health.

48. Plaintiffs were doxed, calumniated, detracted, slandered, and libeled, upon information and belief, by one or more of the Defendants and by one or more news outlet.

49. As a result of the calumny, detraction, and libelous communications and publications of Defendants, the Plaintiffs were subjected to a torrent of abuse, threats of harm and death threats, by members of the public, such that they were not able to remain in their home of many years and have been forced to flee Nelson County for their safety.

50. At or about two days following the service of the Guardianship Order by Defendant Pineiroa, Defendant Hite served Notice of a Motion for Guardianship to be held in the future. The Motion was signed by Defendant Hite, and dated days after the Order was entered. It contained the "Affidavit" signed by Defendant Best and purportedly relied upon by Defendant Judge Seay in his ruling granting the

Guardianship over Michael. Notably the Affidavit was executed days after the Order, establishing that neither the Motion nor the Affidavit existed at the time the Order was "entered". Upon information and belief, Defendant Judge Seay was not present in Kentucky at the time of the entry of the Guardianship Order. The Affidavit was grossly fraudulent throughout, although sworn to be true by Defendant Best. Yet even if the Judge had a justification to think it contained even a scintilla of truth, he could not have relied on a sworn affidavit that either did not exist on March 14, or was not sworn until later.

51.     Upon information and belief, at or about the 14th, when Plaintiffs were falsely imprisoned, Defendant Watts issued some sort of Special Order calculated to create a County-wide "Emergency", in order to facilitate the fraudulent scheme to imprison Michael, Angela and anyone else who may have been at the residence.

52.     During the wrongful imprisonment, Defendant Beshear used his official platform as Governor to draw negative attention on the Plaintiffs on one or more occasions, using language calculated to humiliate the Plaintiffs, draw state and national negative attention to what they had supposedly done, to incite the anger of the public against the Plaintiffs, and to generally support the criminal conspiracy against the Plaintiffs by the Defendants.

53.     Upon information and belief, the conspiracy to use fraud and force of arms to deprive the Plaintiffs of their rights and unlawfully imprison them against their will, extended between and through and included each of the Defendants, excepting only KCHFS.

54. Since the wrongful imprisonment, UofL has inserted, or caused to be inserted, additional false medical records and/or notes, calculated to further support and cover up the unlawful actions which lead to the injuries sustained by the Plaintiffs.

55. Plaintiffs allege that the actions by the Defendants were intentional, fraudulent, malicious, and calculated to injure the Plaintiffs specifically by impoverishing them in a multitude of ways to the benefit of the various Defendants. The actions were coordinated through a conspiracy between the Defendants to commit these unlawful acts, and then to support and extend them and the Defendants are jointly and severally liable for some or all of the damages sustained by the Plaintiffs.

56. Each defendants' individual actions were traceable to injuries suffered by plaintiffs.

57. As a result of the above referenced actions the Plaintiffs have been harmed individually and collectively in ways that include, without limitation, deprivation of Constitutionally protected fundamental liberties without process of any kind, financial harm, emotional and mental cruelty and harm, loss of consortium, psychological harm, loss of property, loss of reputation, loss of livelihood, injuries to their health, present and future. Some or all of these harms are irreparable in nature.

58. The Plaintiffs are entitled to actual damages. They are entitled to Monetary and equitable remedies, as well as their attorney fees. They are entitled to their costs and fees. They deserve to be made as whole as the law can manage. They will never fully recover from the extreme mental and emotional anguish that they

were subjected to. The health of some or all of them will be forever impaired. They have lost friends, community and the family history they built, over time, in their homeplace. They now live in fear and many of these damages are ongoing and unabated. Plaintiffs are also entitled to punitive damages in an amount adequate to punish the wrongdoers and to deter others from engaging in similar behavior.

59. Plaintiffs deserve the unbridled discretion of the Court, wielded with the passion for the Constitution and the Rule of Law that is the hallmark of our great Judicial Branch of Government.

60. This arbitrary, cruel and casual taking, and conspiring and harming American Citizens is so extraordinary in history, and so dangerous a precedent that if permitted to stand, other tyrants around the Country may be emboldened to engage in similar or more egregious behavior.

61. An historic and unprecedented act of violence against the very Cornerstone of American Liberty must be met with an historic and unprecedented response.

62. Civil money damages are available under 42 U.S.C. § 1983 where plaintiffs can show a clear constitutional violation, and have sued government employees in their personal capacities. Tanzin v. Tanvir, 141 S.Ct. 486, 490 (2020) ("[42 U.S.C. § 1983 applies to 'person[s] acting under color of any statute' and this Court has long interpreted it to permit suits against officials in their individual capacities.").

63. Plaintiffs collectively then are seeking total damages in an amount not less than six hundred and fifty million dollars ($650,000,000). Plaintiffs seek such

other damages as may be supported by relevant primary and secondary authority, and such discretion as a Court dare to exercise in protection of the Rule of Law. Plaintiffs therefore seek a Declaratory Judgment that the KRS provisions specifically relied upon by the State in promulgating its endless Emergency Mandates, are an unconstitutional delegation of legislative power.

64. Plaintiffs have been burdened in the free exercise of various fundamental liberties including without limitation their faith, rights of association, peaceable assembly, personal autonomy, bodily integrity, the right to work, the right to move about freely, and all without any due process in violation of the Equal Protection Clause of the 14th Amendment. Plaintiffs therefore seek a Declaratory Judgment that the Defendants have violated said fundamental rights and have deprived them of the equal protection of the laws under the Equal Protection Clause of the 14th Amendment, and in violation of the Kentucky Constitution. Defendants, under color of the Emergency Mandates, have physically, mentally, and emotionally injured Plaintiffs in the process of depriving them of their clearly established constitutional rights, privileges and immunities of which a reasonable person would have known, in all of the ways alleged in this Complaint.

## VIII.  PRAYER FOR RELIEF

WHERFORE, and for the foregoing reasons, Plaintiffs request that this Court award to each of the Plaintiffs,

1. Damages in the amount demanded above so that all other governments and officials will understand the gravity and enormity of what was done to these

Plaintiffs and may be deterred forever from engaging in similar gross violations of fundamental liberties protected by the Constitution of the United States of America.

2. Under 42 U.S.C. § 1983, together with Kentucky Statutory Authority as the law permits, compensatory damages, including both economic and non-economic damages together with punitive damages where available and appropriate, against the Defendants; and

3. Such additional and additional relief as the Court deems fit.

### IX. JURY DEMAND

Plaintiffs request a jury trial on all issues so triable, including without limitation the quantum of damages.

Dated: March 07, 2022.

Respectfully submitted,

| Thomas Renz, Esq. (Ohio Bar No. 98645)<br>RENZ LAW, LLC<br>1907 W. State Street, Suite 162<br>Fremont, OH 43420<br>Tel. 419-351-4248<br>*Attorney for Plaintiffs*<br>*(Admission Pending Pro Hac Vice)* | By: /s/ *Michael A. Hamilton*<br>Michael A. Hamilton, Esq.<br>(KY Bar No. 89471)<br>HAMILTON & ASSOCIATES<br>1067 N. Main St, PMB 224<br>Nicholasville, KY 40356<br>Tel. 859-655-5455<br>*Attorney for Plaintiffs* |